IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Charlene Bigelow, as independent administrator of the estate of Devin Lynch, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| -vs- | ) ) | No. 18-cv-2055 |
| Thomas Dart, Sheriff of Cook County, Correctional Officer Darrell Maloy (Star 16247), and Cook County, Illinois, | ) ) ) ) ) ) | Judge Blakey |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff, by counsel and pursuant to leave of Court, alleges as follows:

1. This is a civil action arising under 42 U.S.C. § 1983. The jurisdiction of this Court is conferred by 28 U.S.C. § 1343.

2. Plaintiff has been appointed as Independent Administrator of the estate of Devin Lynch, her son, by the Circuit Court of Cook County under case No. 2018 P 008263.

3. Devin Lynch, deceased, is a former detainee at the Cook County Department of Corrections (CCDOC). He sues by his mother, the Independent Administrator of the estate of Devin Lynch, for claims arising from his death.

4. Defendant Thomas Dart is the Sheriff of Cook County. Plaintiff sues Dart in his official capacity only.

5. At all times relevant defendant Correctional Officer Darrell Maloy was employed as a correctional officer at the CCDOC. He is sued in his individual capacity.

6. Defendant Cook County shares responsibility with defendant Sheriff for overseeing and supervising inmates identified as requiring mental health care and is joined in this action pursuant to *Carver v. Sheriff of LaSalle County,* 324 F.3d 947 (7th Cir. 2003).

## BACKGROUND

7. On July 11, 2008, the United States Department of Justice sent a letter to Sheriff Dart and Cook County following a lawful investigation into policies and practices at the CCDOC. This investigation, among many findings, concluded the Sheriff and County did not provide specialized training concerning suicide prevention to correctional officers working with individual with mental illness, and the CCDOC did not provide staff with quick access to cut-down tools for quick response in the event of a suicide attempt by hanging.

8. In 2010, defendants Sheriff and Cook County entered into an Agreed Order in *United States v. Cook County*, 10 C 2946. The Agreed Order imposed a variety of obligations on defendant Sheriff and Cook County, including joint responsibility to monitor detainees exhibiting psychological symptoms at the CCDOC.

9. In early 2011, defendant Sheriff and Cook County entered into an Inter-Agency Agreement. The Inter-Agency Agreement requires the County to plan and review training for Sheriff's employees in the area of suicide prevention and recognition of acute manifestations of certain medical and mental health problems. The agreement also requires Cook County to collaborate with the

Sheriff to train and monitor Sheriff's staff designated to supervise detainees with documented mental health conditions.

10. The Sheriff and County both are responsible for the housing of inmates with mental health conditions.

11. Inmates with diagnosed mental health conditions are assigned to living units (or tiers) at the CCDOC. These living units are frequently referred to as a "psych tier" at the CCDOC.

12. The Sheriff and Cook County jointly opened a new division at the CCDOC in 2013 called the Residential Treatment Unit (RTU). The RTU was designed to house inmates with diagnosed physical and psychological ailments.

13. The RTU has been grossly understaffed.

14. The chronic staff shortages caused the Sheriff's sworn members to be unable to provide basic security to detainees.

15. Most importantly, the staff shortages significantly interferes with the Sheriff and County's ability to supervise and monitor detainees in the RTU assigned to a "psych tier" because the correctional officers lack the specialized training and knowledge to provide security for detainees with mental illness.

16. Due to the staffing shortages, Cook County is unable to train an adequate number of the Sheriff's sworn staff responsible for supervising and monitoring inmates assigned to a "psych tier."

17. The Sheriff also does not have sufficient staff to adequately staff each "psych tier" causing significant gaps in security.

18. In March 2016, Tier 2B of the RTU was designated by the Sheriff and County as a "psych tier."

19. At all relevant times, the Sheriff and County required Tier 2B to be under "direct supervision."

20. "Direct supervision" means direct and continuous supervision of inmates by a sworn member on a 24-hour basis requiring the sworn member to be in direct and oral contact with the inmates.

21. Every tier in the RTU must have a security check pursuant to the policy of the CCDOC at least every 30 minutes. It is common knowledge that some tiers in the RTU designed as a "psych tier" must have more frequent security checks due to the type of inmates housed in the living unit.

22. A security check requires a tier officer to walk the entire tier, communicate with all inmates, inspect the bathroom, utility closet, and to make sure all doors and windows are secure.

23. To conduct a security check, it is necessary for two correctional officers to be present on a tier.

24. Due to chronic staff shortages in the RTU, it is common practice that tier officers do not conduct 30 minute security checks.

25. The Sheriff is aware that tiers in the RTU are not provided adequate security and that this poses a major security risk because tier officers document "visual checks only" - or the tier officer merely observed the living unit from the officer's desk - in the Officer's Living Unit Log.

26. The failure to conduct a 30 minute security check causes inmates and staff to be at serious risk of harm.

27. Also because of chronic staff shortages, the CCDOC has been unable to assign two correctional officers to various "psych tiers" and high security tiers in the RTU.

28. The Sheriff's executive staff and Cook County's executive medical staff at the CCDOC have personal knowledge that inadequate staffing at the CCDOC, including the RTU, is dangerous and has contributed to serious personal injuries to inmates and staff.

29. At all times relevant in 2016, the Sheriff did not take any reasonable action to remedy the significant staff shortages at the CCDOC.

30. Additionally, since the opening of the RTU until at least March 2016, it was known to leadership of the Sheriff and Cook County that the "psychological tiers" did not have sufficient staffing of officers with specialized training to monitor and supervise detainees diagnosed with mental health needs.

31. Defendants Sheriff and Cook County knew the absence of specially trained correctional officers to monitor and supervise detainees assigned to a "psych tier" exposed inmates to unnecessary risk of harm because the assigned staff lacked the ability to make on-going assessments when an inmate's behavior indicated he may harm himself.

## DEVIN LYNCH'S INCARCERATION AT CCDOC

32. Devin Lynch was a member of the Marine Corps reserves when he was processed into the CCDOC on February 6, 2016. As a Marine, he had served in Afghanistan.

33. The intake process at the CCDOC includes a medical evaluation by defendant Cook County. During this process, defendant Cook County documented Mr. Lynch suffered from depression, anxiety, and post-traumatic stress disorder. Defendant Cook County also noted that Mr. Lynch had attempted suicide twice, the most recent attempt being February 5, 2016.

34. Because of Mr. Lynch's medical history, a Cook County medical provider ordered defendant Sheriff to assign Mr. Lynch to an "Intermediate Mental Health" living unit. This type of living unit is also known as a "psych tier."

35. Defendants Sheriff and Cook County were aware that Mr. Lynch required specialized observation and monitoring because of his mental health history.

36. Defendants Sheriff and Cook County jointly determined Mr. Lynch required placement in the RTU, Tier 2B, a "psych tier."

37. On March 22, 2016, defendant Maloy was assigned to the RTU, Tier 2B as the "tier officer" from 3:00 p.m. to 11:00 p.m.

38. On March 22, 2016, defendant Maloy was the only "tier officer" assigned to Tier 2B on the 3:00 p.m. to 11:00 p.m. shift.

39. On March 22, 2016, defendant Maloy was not trained by either the Sheriff or County to supervise inmates assigned to a "psych tier."

40. On March 22, 2016, defendant Maloy did not have quick access to a cut-down tool on Tier 2B and had received no training as how to respond when an inmate is discovered hanging.

41. On March 22, 2016, defendant Maloy was not provided a backup officer to conduct security checks.

42. During the afternoon of March 22, 2016, Mr. Lynch exhibits suicidal behavior:

    a. Between 1630 and 1708 Mr. Lynch is on the dayroom telephone.

    b. Shortly after 1708 Mr. Lynch enters the bathroom crying.

    c. At 1730 Mr. Lynch checks the door of a utility closet and returns to the telephone.

    d. At 1734 Mr. Lynch walks to the bathroom crying.

    e. Between 1735 and 1809 Mr. Lynch obtains sheets from his bed and brings them into the bathroom.

43. At 1921 hours defendant Maloy opens a utility closet in the bathroom of Tier 2B at the request of Mr. Lynch.

44. It is common knowledge that a correctional officer may never leave unlocked the utility closet in a dorm. The utility closet has various items that may be used to harm inmates and it is common knowledge that on a "psych tier," such as 2B, an inmate may use the location to harm himself.

45. During security checks, the tier officer must inspect the utility closet on Tier 2B.

46. After the utility closet is unlocked, Mr. Lynch continues to exhibit behavior that cries out for the attention of the assigned tier officer.

    a. Mr. Lynch makes a final phone call at 2009 which ends at 2040.

    b. At 2045 Mr. Lynch removes the contents of the utility closet.

    c. At 2046 it is obvious bed sheets are around Mr. Lynch's neck and additional sheets are concealed under his uniform.

    d. Between 2054 and 2055 Mr. Lynch is inside the utility closet and opens and shuts the door several times. At 2055 the utility closet is closed completely.

47. Defendant Maloy does not identify Mr. Lynch until 2147. At this time, Mr. Lynch is found hanging in the utility closet.

48. Defendant Maloy did not have access to a cut-down tool. The removal of the noose around Mr. Lynch's neck was delayed because defendant Maloy had to wait for other correctional officers to come into the tier with a knife to cut Mr. Lynch down. Prompt action by defendant Maloy when he discovered Mr. Lynch hanging in the utility closet may have saved his life.

49. Mr. Lynch was pronounced dead at 2207 by a physician employed by defendant Cook County.

## COUNT 1: FAILURE TO PROTECT DEFENDANT MALOY

50. As described above, due to the suicidal behavior of Mr. Lynch on March 22, 2016, there was a strong likelihood that he would seriously harm himself.

51. Defendant Maloy was aware of this strong likelihood that Mr. Lynch would seriously harm himself in the near future as a result of his behavior on March 22, 2016.

52. Defendant Maloy consciously failed to take reasonable measures to prevent Mr. Lynch from committing suicide. Defendant Maloy also failed to take reasonable measures to immediately remove the noose when he discovered Mr. Lynch hanging in the utility closet.

53. Mr. Lynch would have survived if defendant Maloy had not disregarded these risks.

## COUNT 2: LIABILITY OF DEFENDANT SHERIFF AND COOK COUNTY

54. As described above, defendants Sheriff and Cook County have been aware of systemic gaps for protecting inmates exhibiting suicidal behavior since at least 2008.

55. Due to severe staff shortages, defendants Sheriff and Cook County have been unable to provide correctional officers with specialized training to supervise and monitor inmates assigned to "psych tiers."

56. Defendants Sheriff and Cook County know that inmates assigned to various "psych tiers" in the RTU are at unreasonable risk of harm because of severe staff shortages and deficient training.

57. Defendants Sheriff and Cook County did not take any reasonable measure to remedy the grossly inadequate security in the RTU's "psych tiers."

58. The above described policies and widespread equivalent practices were the moving force behind the death of Mr. Lynch.

59. Plaintiff requests trial by jury on his claim for damages.

It is therefore respectfully requested that the Court grant appropriate compensatory damages as well as punitive damages against defendant Maloy. Plaintiff also requests that the costs of this action, including attorney's fees, be taxed against defendant Cook County.

/s/ Patrick W. Morrissey
ARDC No. 6309730
Thomas G. Morrissey, Ltd.
10150 S Western Ave. Ste. Rear
Chicago, IL. 60643
(773) 233-7900
patrickmorrissey1920@gmail.com